UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

GEORGE FRANCIS, in his own right and as Administrator of the ESTATE OF SHEREESE FRANCIS, deceased, ELEEN FRANCIS, SHAUNA FRANCIS,

                             Plaintiffs,

        -v-

The CITY OF NEW YORK, the NEW YORK CITY POLICE DEPARTMENT, Police Officer ELIO PONZO, Police Officer JOSEPH TOMEO, Police Officer MICHAEL BOYLE, Police Officer WILLIAM CLEMENS, Police Officer EDISON JARAMILLO, Police Officer f/n/u BARRETT, Police Officer f/n/u YOON, NYPD Sgt. f/n/u MCKOY, JAMAICA HOSPITAL MEDICAL CENTER, JHMC AMBULANCE, MELISSA QUIROA, THOMAS SCHROETER, Police Officers John Doe 1-10, Police Officers Jane Doe 1-10, NYPD Supervisory Officers Richard Roe 1-10,

                         Defendants.

---

13 Civ. 505 (FB)(JO)

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**ECF Case**

**Jury Trial Demanded On All Counts**

Steve Vaccaro
Law Office of Vaccaro & White
225 Broadway, 13th floor
New York, NY 10007
(212) 577-3040
Steve@VaccaroandWhite.com

David B. Rankin
Robert M. Quackenbush
Law Office of Rankin & Taylor
11 Park Place, Suite 914
New York, NY 10007
(212) 226-4507
David@DRMTLaw.com
Robert@DRMTLaw.com

*Counsel for Plaintiffs*

**SUMMARY**

1.      This action arises from the unjustified killing of Shereese Francis by police officers, and the conspiracy of the Defendants to cover it up.

2.      On March 15, 2012, Shereese Francis, an unarmed 29 year-old woman, was killed in her own home by NYPD officers summoned by her family to transport her to the hospital for psychiatric evaluation and care.

3.      The officers needlessly antagonized Shereese, chased her and tackled her onto a bed, pressed their weight on her until she suffered cardiac arrest, and then prevented her from receiving appropriate, timely medical care.  Because the officers lacked adequate training and supervision, they violated virtually every NYPD protocol, rule and guideline governing police interaction with persons with mental illness.

4.      Immediately after Shereese's death, a conspiracy to cover up the killing began.  The officers agreed upon a false account of Shereese's death.  Shereese was falsely accused of being the aggressor against the police, and was falsely claimed to have died only after leaving NYPD custody.  On information and belief, this false account was spread within NYPD, to other city agencies and to the press in an attempt to blame and stigmatize the victim.

5.      Plaintiffs seek redress against (*a*) the unconstitutional and tortious conduct of the NYPD officers that fatally injured Shereese Francis and denied her timely emergency care; (*b*) those conspiring with those officers, for their reckless and intentional false statements aimed at depriving Shereese Francis of her civil and other rights; and (*c*) the City of New York and NYPD, for their deliberate indifference to customs, policies,

2

and practices that perpetuated an environment lacking in adequate training and supervision of NYPD personnel, and in reasonable accommodations for persons with mental illness, which resulted in Shereese Francis's death.

6.      This action is brought pursuant to 42 U.S.C. Sections 1983, 1988, 12132, and 29 U.S.C. Section 794(a); the Fourth and Fourteenth Amendments to the United States Constitution; and the laws of the State of New York.  Jurisdiction is founded upon 28 U.S.C. Sections 1331 1343, and 2202.  Plaintiffs further invoke the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. Section 1367.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

8.      Plaintiff George Francis, the father of Shereese Francis and the administrator of the Estate of Shereese Francis, is and has been at all relevant times a resident of Elmont, New York.  George Francis seeks relief in his individual and his representative capacity.

9.      Plaintiff Eleen Francis is the mother of Shereese Francis.  At all relevant times she has been a resident of Queens County, New York.

10.      Plaintiff Eleen Francis is the sister of Shereese Francis.  At all relevant times she has been a resident of Queens County, New York.

11.      Defendant the City of New York (the "City") is a municipal corporation, existing and operating by virtue of the laws of the State of New York.

3

12.     Defendant New York City Police Department ("NYPD") is a department, program and activity of the City that receives federal financial assistance.

13.     Defendant Elio Ponzo ("Ponzo") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

14.     Defendant Joseph Tomeo ("Tomeo") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

15.     Defendant Michael Boyle ("Boyle") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

16.     Defendant William Clemens ("Clemens") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

17.     Defendant Edison Jaramillo ("Jaramillo") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

18.     Defendant f/n/u (first name unknown) Barrett ("Barrett") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

19.     Defendant f/n/u Yoon ("Yoon") was, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

20.     Defendant f/n/u McKoy ("McKoy") was, at all relevant times, an NYPD sergeant and an employee and agent of the City and of NYPD.

21.     Defendant Jamaica Hospital Medical Center ("JHMC") was at all relevant times a corporation providing medical services, with its principal place of business at 8900 Van Wyck Expressway, Jamaica, New York.

22.     Defendant JHMC Ambulance was at all relevant times a corporation providing medical services, with its principal place of business at 8900 Van Wyck Expressway, Jamaica, New York.

23.     Defendant Melissa Quiroa ("Quiroa"), Shield 7049, was at all relevant times an Emergency Medical Technician employed by JHMC and/or JHMC Ambulance.

24.     Defendant Thomas Schroeter ("Schroeter"), Shield 7115, was at all relevant times an Emergency Medical Technician employed by JHMC and/or JHMC Ambulance.

25.     Defendants John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9 and John Doe 10 (together, "John Does 1-10") were each, at all relevant times, an NYPD Police Officer and an employee and agent of the City and of NYPD.

26.     Defendants Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9 and Jane Doe 10 (together, "Jane Does 1-10," and, together with Ponzo, Tomeo, Boyle, Clemens, Jaramillo, Barrett, Yoon and John Does 1-10, the "Police Officer Defendants") were each, at all relevant times, an NYPD police officer and an employee and agent of the City and of NYPD.

27.     Defendants Richard Roe 1, Richard Roe 2, Richard Roe 3, Richard Roe 4, Richard Roe 5, Richard Roe 6, Richard Roe 7, Richard Roe 8, Richard Roe 9 and Richard Roe 10 (together, "Richard Roes 1-10," and, together with McKoy, the "Supervisory Officer Defendants") were each, at all relevant times, a supervisory officer employed by NYPD with direct or indirect oversight responsibility for one or more of the Police

5

Officer Defendants, and an employee and agent of the City.  Richard Roes 1-10 were each responsible for screening, hiring, training, instruction, supervising, disciplining and/or policy-making with respect to one or more of the Police Officer Defendants and/or one or more of the Supervisory Officer Defendants.

28.     With respect to acts and omissions set forth in this complaint, the Police Officer Defendants and the Supervisory Officer Defendants (together, the "Individual Defendants") were each acting under color of state law and in the course and scope of his or her duties and functions as an agent, servant, employee and/or officer of the City, and/or was engaged in conduct incidental to the performance of those functions.  The Individual Defendants each are sued individually.

## PRECONDITIONS TO STATE LAW CLAIMS

29.     On July 23, 2012, Plaintiffs filed timely notice of claim against the City in compliance with New York General Municipal Law §50-e.

30.     More than 30 days have elapsed since service of said notice and the City has failed to pay or adjust the claim.

31.     Plaintiffs have complied with all conditions necessary to bring this lawsuit.

## FACTUAL BACKGROUND

A.     **The Life of Shereese Francis.**

32.     At the time of her death on March 15, 2012, twenty-nine year-old Shereese Francis resided in her family home at 132-33 154th Street, Jamaica, New York.

Shereese was generally a friendly and outgoing person, well-liked in her neighborhood, at work, and her church.

33.     Shereese was diagnosed with a mental illness at 20 years old in 2003. With the help of medication, counseling and a supportive network of family and friends, she continued to lead a full and productive life.  During this period, Shereese worked successfully as a day care assistant and in other jobs through 2009, and worshipped regularly at her church.

34.     While the medication controlled Shereese's mood and symptoms, it caused unpleasant and dangerous side effects, including obesity.  In addition, in at least one instance, her insurer denied coverage for the medication.  For these reasons, Shereese did not always take her medication.

35.     When Shereese stopped taking her medication, she often would become lethargic and withdrawn.

36.     At no time prior to the day she died did Shereese manifest aggressive or violent behavior as a result of her mental illness.

37.     When Shereese's parents observed their otherwise friendly and outgoing daughter becoming lethargic and withdrawn, they would arrange for her to receive psychiatric evaluation and treatment, usually at a hospital.  This occurred in April 2009, July 2009, January 2010, and April 2011, and October 2011.  On at least two of these occasions, Shereese brought herself to the hospital.

38.     These hospital stays were successful.  In each case, Shereese resumed the use of medication, participated in verbal therapy, overcame her lethargy and other

symptoms, and was discharged from the hospital with a referral to social services and day treatment programs.  In each case, Shereese was able to resume her usual way of life.

39.     In late November 2011, Shereese was experiencing debilitating side effects and again stopped using her medication.  As on prior occasions, she became withdrawn and stopped leaving her house.  Eventually, she stopped leaving her bedroom.

40.     In late December 2011, social workers made several visits to Shereese at her home, to persuade her to resume medication and treatment.  Shereese refused to do so.  It was the opinion of these social workers that Shereese should not be hospitalized against her will.  The social workers told the Francis family that involuntary hospitalization should be reconsidered if Shereese's symptoms worsened.  They did not, and accordingly, Shereese remained at home with her family through the winter and into March 2012.

**B.     The Events Leading to Shereese Francis's Death.**

41.     During the night of March 14, 2012, Shereese Francis slept poorly or not at all.

42.     On March 15, 2012, Shereese became convinced that her mother, Eleen Francis, had taken her cosmetics.  Eleen explained to Shereese that this was not true. Shereese rejected the explanation and argued with Eleen.  At one point during the argument, Shereese pulled Eleen's hair in frustration.

43.     Eleen then went to Shereese's room, and showed Shereese that she had overlooked her cosmetics.  Shereese recognized her mistake and her frustration quickly dissipated.  Mother and daughter put the dispute behind them.

44.     Nonetheless, Eleen was concerned by the episode, because Shereese had **never before manifested such behavior as a result of her mental illness.**

45.     Eleen discussed the incident with Shauna Francis, Shereese's sister.  The two concluded that Shereese needed psychiatric care to regain medication compliance.

46.     Shauna Francis contacted the 911 operator at approximately 10:20 p.m. on March 15, 2012 and requested an ambulance to transport Shereese to a hospital.

47.     Although Shauna did not request police involvement, at approximately 10:23 p.m., the NYPD central dispatch operator ("Central") dispatched two "sectors" (groups of officers) to Shereese's home.

48.     Via radio broadcast, Central advised the officers responding to the assignment that the job was a "54," meaning a request for an ambulance.

49.     Central also advised the officers that the job involved an "EDP" (emotionally disturbed person) who was "not taking her medication."

50.     Immediately after assigning the officers to respond to the ambulance call at the Francis home, Central asked an NYPD sergeant (on information and belief, McKoy) if he was "on the job," meaning would he also respond to the ambulance call at the Francis home along with the two sectors of officers.

51.     In response, the sergeant asked Central "is she violent?"

52.     Central replied to this question, "she's not taking her medications."

53.     The sergeant then indicated that the officers responding to the ambulance call should contact him, without stating whether he would respond to the scene.

C.      NYPD's Ostensible Procedures Governing Officers'
        Interaction with Persons with Mental Illness.

54.     NYPD has prepared a number of written policies, protocols, guidelines

and training materials, ostensibly for the purpose of training, guiding and supervising

interaction between NYPD personnel and persons with persons with mental illness.

55.     NYPD Patrol Guide Section 216-05 sets forth NYPD protocol concerning

interactions with "Mentally Ill or Emotionally Disturbed Persons" (known among NYPD

personnel as "EDPs").

56.     The stated purpose of Section 216-05 is to "safeguard a mentally ill or

emotionally disturbed person who does not voluntarily seek medical assistance."

57.     The "Scope" of Section 216-05 states:  "If an EDP is not immediately

dangerous, the person should be contained until assistance arrives. . . . When there is time

to negotiate, all the time necessary to ensure the safety of all individuals will be used."

58.     Section 216-05, subsection 1(c) further directs that "if EDP's actions do

not constitute an immediate threat of serious physical injury or death to [her]self or

others: (1) attempt to isolate and contain the EDP while maintaining a zone of safety [a

distance which is dependent upon the particular circumstance but which is generally

considered to be distance of 20 feet from the person] until arrival of patrol supervisor and

Emergency Service Unit personnel.  (2) ***Do not attempt to take the EDP into custody***

***without the specific direction of a supervisor.***" (emphasis added).

59.     Section 216-05, subsection 2(a) provides that, in the event an EDP is

unwilling to voluntarily seek medical assistance, an officer is required to "[a]scertain if

[a] patrol supervisor is responding, and, if not, request [a] response."  Subsection 2(a)

10

further provides: "NOTE: Communications Section will automatically direct the patrol supervisor and Emergency Service Unit to respond to scene in such cases."

60.    Further, NYPD Patrol Guide Section 203-11, entitled "Use of Force," states:  "Only that amount of force necessary to overcome resistance will be used to effect an arrest or take a mentally ill or emotionally disturbed person into custody."

61.    Section 203-11 also cautions:  "Whenever possible, members should make every effort to avoid tactics, such as sitting or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe."

62.    Section 203-11 further directs: "After an individual has been controlled and placed under custodial restraint using handcuffs and other authorized methods, the person should be positioned so as to promote free breathing. The subject should not be maintained or transported in a face down position."

63.    NYPD has prepared training materials that elaborate upon these sections of the Patrol Guide.  In one of them, a chapter contained in training materials distributed to students at the NYPD Police Academy entitled "Police Student's Guide: Policing the Emotionally Disturbed" (New York Police Department, 2009), NYPD specifically advises that:

- EDP's should be treated with patience and understanding.  They should not be forcibly handled unless it is clear there is no other way to meet your responsibility to protect life."

- "Never use force or threat of force against an EDP unless there is no other way to protect life against imminent danger."

- "Officers should take as much time as necessary to take EDP's into custody.  These are not situations to be rushed.  Specially trained and equipped Emergency Service Unit ("ESU") officers will be

11

automatically dispatched to respond to assignments involving EDP's . . . ."

- "Officers should take great care to assure that they do not restrain or confine EDP's in ways that may hurt – or even kill – them. **NEVER CONFINE EDP's – OR ANYBODY ELSE – IN FACEDOWN, PRONE POSITIONS FOR LONGER THAN IT TAKES TO HANDCUFF THEM."** (emphasis in original)

- "Do not challenge an EDP's perceptions. These may be hallucinations or delusions, but they are real to [her]."

- "Do not act in a confrontational manner by arguing with or challenging the EDP."

- "Take as much time as you need to avoid injury to anybody: in these situations, time works to your advantage. Don't lose this advantage by rushing or forcing a confrontation."

- "In any case, when there is time to negotiate, take all the time necessary to insure the safety to all individuals concerned. Await the arrival of the supervisor and the [ESU] whenever no immediate action to prevent injury or death is required."

**D.     NYPD's Custom and Practice of Failing to Supervise and Train Officers With Respect to Interaction with Persons with Mental Illness**

64.     Despite NYPD's preparation of written policies, protocols, guidelines and training materials with respect to interactions with persons with mental illness, NYPD has a custom and practice of failing to adequately supervise and train officers with respect to such interactions that are so persistent and widespread as to carry the force of law.

65.     This failure has taken place, despite the fact that one or more of Richard Roes 1-10, persons who have authority to set NYPD policy with respect to interactions between NYPD personnel and so-called EDPs, know: (*a*) to a moral certainty that such interactions would frequently and routinely occur; (*b*) that such interactions present

12

NYPD personnel with difficult choices and/or have been too often mishandled; and (*c*)

that the mishandling of such interactions would frequently result in the deprivation of

civil rights.

66.     Mental health professionals and advocates have long called upon NYPD to

institute minimally adequate supervision and training of NYPD personnel with respect to

interactions with persons with mental illness, using generally-accepted best practices

endorsed by law enforcement officials throughout the United States.  NYPD has refused

to do so.

67.     In 2008, NYPD formed a "Link Committee" composed of certain mental

health professionals and advocates and several of Richard Roes 1-10, ostensibly for the

purpose of, among other things, ensuring minimally adequate NYPD supervision and

training with respect to NYPD interactions with persons with mental illness.

68.     On information and belief, those of Richard Roes 1-10 who served on the

Link Committee were instructed by their superiors against, and had no intention of,

ensuring minimally adequate NYPD supervisory and training policy with respect to

police interactions with persons with mental illness.

69.     The LINK Committee was eventually disbanded, without issuing any

report or recommendations with respect to NYPD interactions with persons with mental

illness.

**E.     The Officers' Disregard for Procedures in Confronting Shereese Francis.**

70.     At approximately 10:26 p.m. on March 15, 2012, four of the Police

Officer Defendants dispatched by Central in response to Shauna Francis's ambulance

request arrived at the Francis home, at 132-33 154th Street.  At that time, no ambulance had arrived.

71.     Shauna Francis guided the four male officers to Shereese's bedroom.  One of the officers drew his gun as the approached her bedroom, but then returned it to its holster.

72.     The officers found Shereese Francis, a 29 year-old African-American woman, in her bedroom, wearing a nightgown and no footwear.

73.     Shereese was unarmed and carried no objects, and she remained so throughout her encounter with the officers.

74.     The officers gathered around the door to the bedroom and indicated to Shereese that she had to go to the hospital.

75.     Shereese was confused.  She did not grasp that these strangers in her home were police officers.  She refused to go to the hospital.

76.     One of the officers challenged Shereese, insisting she acknowledge he was a police officer and that she "definitely" must go to the hospital.

77.     This officer did so, despite the admonition in NYPD training materials to "not act in a confrontational manner by arguing with or challenging the EDP."

78.     The officer knew, or should have known, that confronting and antagonizing Shereese in this manner would decrease the likelihood that she would voluntarily seek medical treatment.

79.     On information and belief, the officer confronted Shereese in this manner because, among other reasons, he had not been adequately trained, monitored, guided or

supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons with mental illness.

80.     Shereese argued with the officer, but did not take any action to threaten or endanger the officers or herself.

81.     Instead, Shereese attempted to dispatch the officers from her home by threatening to "call the cops on" them, and by making other statements clearly demonstrating her failure to grasp that these strangers in her home were police officers. This misperception on Shereese's part was due to her mental illness.

82.     The officers failed to recognize Shereese's delusional statements for what they were, and instead mistook them as a challenge to their authority.  The officers made this mistake because they had not been adequately trained, monitored, guided or supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons with mental illness.

83.     On information and belief, the officers felt challenged in their authority and aggressively demanded, after less than five minutes of speaking with Shereese, that she go with them.

84.     The officers rushed their encounter with Shereese in this manner, despite the directive in the NYPD Patrol Guide that "When there is time to negotiate, all the time necessary to ensure the safety of all individuals will be used," and the urging of the NYPD training materials that "Officers should take as much time as necessary to take EDP's into custody.  These are not situations to be rushed."

85.     At approximately 10:31 p.m., five minutes after their arrival at the Frances home, one of the officers at the scene advised Central to cancel the response of the ESU to the Francis home.

86.     The officer cancelled the ESU's response to the scene, despite NYPD procedures calling for ESU involvement in cases where an EDP refuses to voluntarily accept transport for medical attention.

87.     The officer cancelled the ESU's response to the scene because, among other reasons, he had not been adequately trained, monitored, guided or supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons with mental illness.

88.     After the officers had antagonized Shereese for approximately five minutes, Shereese sought to end the confrontation by leaving her bedroom.  In order to exit her bedroom, she had to pass the officers clustered about the doorway.

89.     Shereese exited her room past the officers.  At no time prior to or during her exit from the room did she attack, assault, or "lunge" at any officer, carry any weapon or other object in her hand, or in any way make or pose a threat to the safety of herself or others.

**F.      The Officers' Unsupervised Pursuit and Restraint of Shereese Francis.**

90.     The argument between Shereese and the police officers continued for approximately one minute in the living room adjacent to Shereese's bedroom.  Shereese then attempted to go down a hall leading to her mother's bedroom.

91.     As Shereese entered the hall, one of the officers yelled "don't let her get away."

92.     The officers then pursued Shereese down the hallway, and grabbed her by the arms.

93.     The officers commenced this pursuit, despite numerous admonitions in the NYPD Patrol Guide and the NYPD training materials against rushing an encounter with a person with mental illness.

94.     The officers knew, or should have known, that Shereese believed she was being chased in her own home by strangers whom she did not recognize as police officers.

95.     The officers knew, or should have known, that their actions would exacerbate Shereese's confusion and fear, and increase the likelihood of a violent confrontation.

96.     The officers' actions in announcing and commencing a pursuit of Shereese in her own home caused her extreme emotional distress and mental anguish.

97.     Shereese pulled against the officers holding her arms, asking to be let go. The officers would not let her go.  While holding Shereese's arms, the officers then tackled her onto her mother's bed.

98.     The officers restrained Shereese, despite NYPD procedures prohibiting the use of force against an EDP except in cases of immediate danger, and prohibiting the taking into custody of an EDP absent the presence and/or supervision of a supervisor and/or ESU personnel.

99.     The officers knew, or should have known, that pursuing, grabbing and tackling Shereese would further exacerbate her confusion, fear and emotional distress.

100.     The officers' pursuit and tackling of Shereese in her own home was without cause or justification, and undertaken recklessly, wantonly and with gross negligence.

101.     The officers' actions in tackling Shereese onto her mother's bed caused her personal injury, pain and suffering, extreme emotional distress, and mental anguish.

102.     On information and belief, the officers announced and commenced a pursuit of Shereese in her own home and tackled her because, among other reasons, (*a*) they had not been adequately trained, monitored, guided or supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons with mental illness; and (*b*) it is the policy, custom and practice of NYPD to allow, preserve and condone among NYPD officers an environment of disregard for the rights and safety of persons with mental illness.

103.     At approximately 10:36 p.m., two or more emergency medical Technicians ("EMTs"), employed by JHMC, JHMC Ambulance, and/or the Fire Department of the City of New York ("FDNY"), and certified to provide Basic Life Support ("BLS") services, arrived at the Francis home.

104.     On information and belief, the four police officers on the scene instructed the BLS EMTs to stay away from the area in which they were restraining Shereese, and the BLS EMTs obeyed the officers' instruction.

18

105.     At approximately 10:38 p.m., an NYPD sergeant (on information and belief, McKoy) asked Central Dispatch via radio for the address of the Francis home.

106.     By failing to respond promptly to the Francis home when he was first requested to do so, at 10:23 p.m., the sergeant (on information and belief, McKoy) failed to follow the NYPD Patrol Guide protocol requiring the presence of a supervisor on an ambulance call involving an EDP who refuses to voluntarily seek medical treatment.

107.     On information and belief, the sergeant (on information and belief, McKoy) delayed his response to the Francis home because, among other reasons, he had not been adequately trained, monitored, guided or supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons with mental illness.

**G.     The Officers' Beating, Tasing and Asphyxiation of Shereese Francis.**

108.     After pursuing Shereese Francis, grabbing her and tackling her onto her mother's bed, the four male officers climbed onto her and rested their combined weight on her.

109.     One of the officers sat on Shereese's upper back, with one leg on either side of her, riding her as if she were a horse.

110.     The officers did so, despite the NYPD protocol requiring that "[w]henever possible, [officers] should make every effort to avoid tactics, such as sitting or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe."

111.    Unable to breathe with the officers resting on her back, Shereese struggled to free herself.  Meanwhile, the officers pulled Shereese's hands behind her back in order to cuff them.  This struggle ensued for several minutes.

112.    During the struggle, Shauna Francis observed one of the officers position his full weight atop Shereese's upper body as she lay on her stomach, and repeatedly swing his arm in a manner and in a location as if to strike Shereese in the head.  Because of the many officers on top of Shereese, Shauna was unable to see the blows actually land on Shereese's head, but it was apparent to Shauna that the officer was in fact striking Shereese in the head, no less than six times.

113.    During the struggle, another of the officers was trying to pull Shereese's hands behind her back so he could handcuff her.  She resisted.  The officer screamed, repeatedly, "GIMME YOUR F—KING HAND!"

114.    As the officers struggled on top of Shereese, Shauna Francis, though several feet away, could hear her sister making gurgling noises and attempting to breathe.

115.    During the struggle, one of the officers proposed, "why not just use the taser?"

116.    On information and belief, one of the officers used a taser or other similar device to administer electric current to and shock Shereese.

117.    On information and belief, the electric current administered to Shereese caused her extreme pain and suffering, and mental anguish.

118.    On information and belief, the officers administered the electrical current in an improper and negligent manner, contributing to Shereese's pain, suffering, and death.

119.    The officers continued in this manner, resting their combined weight on Shereese, cursing her and apparently beating and/or shocking her, until she went still.

120.    Shauna never saw her sister Shereese move again.

121.    The officers' actions in beating, asphyxiating, cursing and/or shocking Shereese were without cause or justification, and were undertaken intentionally, maliciously, recklessly, wantonly and/or with gross negligence.

122.    The officers' actions in beating, asphyxiating, cursing and/or shocking Shereese were without legal authority in violation of her constitutional rights, including her right to be secure in her person and free from the use of unreasonable force.  These acts are shocking to the conscience.

123.    The officers' actions in beating, asphyxiating, cursing and/or shocking Shereese caused her to suffer extreme pain and suffering, emotional distress and mental anguish, and contributed to her respiratory and cardiac arrest from which she ultimately died.

124.    On information and belief, the officers beat, asphyxiated, cursed and/or shocked Shereese because, among other reasons, (*a*) they had not been adequately trained, monitored, guided or supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons with mental illness; and (*b*) it is the policy, custom and practice of NYPD to allow, preserve and condone among NYPD

officers an environment of disregard for the rights and safety of persons with mental illness.

**H.     The Officers' Delay of Emergency Life Support to Shereese Francis.**

125.    On information and belief, the officers continued to apply weight and force on Shereese Francis for several minutes after she stopped moving.

126.    As Shereese lay motionless, the BLS EMTs remained away from the area where she lay, on information and belief, as instructed by the officers.

127.    At approximately 10:40 p.m., one of the officers advised Central via radio: "Alright Central, everything's calmed down, I just need ESU to come here to bag her up and to get her up the stairs."

128.    On information and belief, the officers' failure to promptly cease applying weight and force to Shereese's body after she had been subdued, and/or their failure to promptly summon the EMTs after she became unconscious, caused and/or contributed to her respiratory and/or cardiac arrest, materially diminishing her chances of survival.

129.    On information and belief, the officers failed to promptly cease applying weight and force to Shereese's body after she had been subdued, and/or failed to promptly summon the EMTs after she became unconscious, because, among other reasons, (*a*) they had not been adequately trained by the City nor adequately supervised by their supervisors with respect to the use of force; and (*b*) it is the policy, custom and practice of NYPD to allow, preserve and condone an environment among NYPD officers of disregard for the rights and safety of persons with mental illness.

130.    When the officers finally ceased applying weight and force to Shereese's body, the lower portion of her body slid from the bed to the floor.

131.    Some time thereafter, the officers finally recognized that Shereese Francis required medical attention.

132.    At approximately 10:42 p.m., one of the officers at the Francis home advised Central by radio, "You should get the boss [i.e., the supervising sergeant, on information and belief, McKoy] over here."

133.    After 10:42 p.m., McKoy and the Police Officer defendants stopped discussing the details of the incident via radio.

134.    One of the officers then directed the others to remove the handcuffs from Shereese.  After removing the handcuffs, the officer laid Shereese on the floor.

135.    At no time did any of the four officers make any attempt to provide emergency care to Shereese Francis.  They did, however, finally summon the BLS EMTs who had been waiting to treat her.

136.    Upon their arrival in the area where Shereese lay, the BLS EMTs examined her and found that she was unconscious and not breathing.  One of these BLS EMTs declared that Shereese had "no pulse."

137.    The BLS EMTs then attempted several basic life support techniques on Shereese, including manual cardio-pulmonary resuscitation.

138.    According to the records of the EMTs, Shereese Francis never again regained consciousness or resumed breathing.

139.    The BLS EMTs that initially examined Shereese Francis recognized that she required advance life support ("ALS") services available only in a hospital or from EMTs with ALS training and equipment.

140.    At approximately 10:46 p.m. a team of ALS EMTs was first summoned to the Francis home.

141.    The ALS EMTs arrived at the Francis home at approximately 10:53 p.m.

142.    Upon arrival in the Francis home, the ALS EMTs found Shereese Francis was unconscious, not breathing, and without a pulse.

143.    On information and belief, the delay in providing ALS services to Shereese Francis materially reduced her chances of survival and/or was a contributing cause of her death.

144.    On information and belief, McKoy, and/or one or more of the other Individual Defendants caused the delay of the arrival of the ALS EMTs at the Francis home, with the purpose and intent of concealing the role of the Individual Defendants in killing Shereese Francis, and/or with deliberate indifference to whether she lived or died.

145.    The BLS and ALS EMTs spent approximately one hour at the Francis home attempting to resuscitate Shereese Francis before bringing her to the hospital.

146.    One or more of the EMTs, and/or Quiroa and Schroeter, intubated Shereese Francis in an effort to help her breathe, but in doing so placed an endotracheal tube into Shereese Francis's esophagus, rather than her trachea.

147.    In misplacing the tube into Shereese Francis' esophagus, one or more of the EMTs, and/or Quiroa and Schroeter, failed to use ordinary, due, reasonable and proper care and caution in providing emergency medical services.

148.    The failure of one or more of the EMTs, and/or Quiroa and Schroeter, to properly intubate Shereese Francis contributed to causing her death.

149.    On information and belief, the delay in bringing Shereese Francis to the hospital was a final, contributing cause of her death.

150.    On information and belief, McKoy and one or more other Individual Defendants caused the delay of the transport of Shereese Francis to the hospital, with the purpose and intent of concealing the role of the Individual Defendants in killing Shereese Francis, and/or with deliberate indifference to whether she lived or died.

151.    Shereese Francis arrived at JHMC at 12:05 on March 16, approximately 90 minutes after she had first lost consciousness.

152.    Upon arrival at JHMC , Shereese Francis was not breathing, had no heart rate, and her pupils were dilated to 5 mm and fixed.

153.    Upon arrival at JHMC, Shereese Francis still had an endotracheal tube improperly lodged in her esophagus.

154.    The failure of one or more of the EMTs, and/or Quiroa and Schroeter, to recognize that Shereese Francis had been improperly intubated in her esophagus was a failure to use ordinary, due, reasonable and proper care and caution in providing treatment to Shereese Francis.

155.   For twenty minutes, JHMC staff attempted in vain to resuscitate Shereese Francis.

156.   At 12:25 a.m. on March 16, 2012, Shereese Francis was pronounced dead.

157.   Upon their arrival at JHMC, Eleen and Shauna Francis were told by hospital personnel that Shereese was dead, and that Shereese had gone into cardiac arrest approximately 90 minutes prior to her arrival at the hospital.

158.   On information and belief, McKoy and one or more other Supervisory Officer Defendants caused a delay in the provision of advanced life support services and hospital services to Shereese Francis because, among other reasons, (*a*) it is the policy, custom and practice of NYPD to allow, preserve and condone an environment among NYPD officers of disregard for the rights and safety of persons with mental illness, and (*b*) it is the policy, custom and practice of NYPD to allow, preserve and condone an environment in which NYPD officers believe they can conceal and escape responsibility for serious misconduct.

159.   The actions and omissions of the Individual Defendants that caused delay in the delivery of appropriate emergency medical care to Shereese Francis were without cause or justification, and were undertaken intentionally, maliciously, recklessly, wantonly and/or with gross negligence.

160.   The actions and omissions of the Individual Defendants that caused delay in the delivery of appropriate emergency medical care to Shereese Francis were without legal authority in violation of her constitutional rights, and are shocking to the conscience.

161.    As a consequence of her death, Shereese Francis was deprived of the pleasures and enjoyment of life, liberty, and the pursuit of happiness.

162.    As a consequence of the death of Shereese Francis, George, Eleen and Shauna Francis were denied the love, society, companionship, intimate family relationship and pecuniary support of their family member Shereese.

**I.      The Attempted Cover-Up of the NYPD Officers' Role in Shereese's Death.**

163.    A conspiracy by the Individual Defendants to cover up the true circumstances of Shereese Francis's death began immediately after the officers on the scene realized she was seriously injured, and continued that night and thereafter.

164.    Upon realizing that Shereese was seriously injured, the four officers that had handcuffed Shereese ordered Shauna Francis to wait in another part of the Francis home, away from Shereese.

165.    Shauna and Eleen Francis waited for approximately an hour, upstairs from the area where the officers, Shereese and the EMTs were located.

166.    During that hour, a Supervisory Officer Defendant (on information and belief McKoy) asked Shauna Francis if she knew what had happened to Shereese. Shauna told the officer that she knew Shereese had stopped breathing.  The officer told Shauna not to tell her mother Eleen anything about Shereese's medical condition, as this would "upset" Eleen.  On information and belief, the officer instructed Shauna not to discuss the matter with her mother in order to conceal the NYPD's role in killing Shereese.

27

167.    During this hour, Eleen Francis attempted to enter the area where Shereese was located.  She found the door blocked so that it would not open, although it was not locked.

168.    During this wait, another Francis family member, Shauna Francis's mother-in-law, arrived.  Shauna's mother-in-law and Eleen Francis exited the Francis home, and attempted to observe Shereese and the EMTs from outside the home, through a window.

169.    In response, an Individual Defendant physically blocked the window from the inside, and ordered the Francis family members to stop attempting to view Shereese through the window of their own home.

170.    During the approximately one-hour long wait prior to the transport of Shereese's body to the hospital, Shauna Francis saw the four Police Officer Defendants who killed Shereese meeting together in the back yard of the Francis home, along with a Supervisory Officer Defendant (on information and belief, McKoy).

171.    On information and belief, these officers were conspiring to fabricate a false account of the circumstances of Shereese's death.  This meeting among the Individual Defendants to fabricate a false narrative was an act undertaken in furtherance of a conspiracy to aid and conceal the violation of Shereese Frances's civil and other rights.

172.    In the false account fabricated by the officers, Shereese allegedly "lunged" at and otherwise violently attacked the officers, supposedly forcing the four of them to restrain her in self-defense.

173.    The false account further held that the injuries sustained by Shereese while the officers handcuffed her were not fatal, and that Shereese regained consciousness while still in her home, dying only after her arrival at Jamaica Hospital.

174.    McKoy included the false narrative in his official written report of the incident, stating that "while aided [Shereese Francis] was in hospital care [she] did go DOA from unknown issues", knowing this statement to be false.

175.    McKoy also relied on the false narrative regarding Shereese Francis's death by stating in a recorded interview conducted by NYPD Internal Affairs Bureau officers that Shereese regained consciousness after being handcuffed, although McKoy knew this to be false.

176.    In making these false statements, McKoy lacked a good faith belief in their truth, and acted negligently, recklessly and/or deliberately.  The incorporation of the false narrative into McKoy's official statements was made in furtherance of the conspiracy to aid and conceal the violation of Shereese Frances's civil and other rights.

177.    After the hour-long wait, Shereese's body was hastily removed from the Francis home, using a back door.  Shereese's body was covered during this removal. Shauna and Eleen Francis attempted to view Shereese while she was being removed, but could see only her feet.

178.    Another family member asked permission from an Individual Defendant to accompany Shereese during the ambulance trip to the hospital.  This request was refused.

29

179.    On information and belief, the request to accompany Shereese in the ambulance was refused in order to conceal from the Francis family that Shereese was dead.

180.    On information and belief, one or more Individual Defendants directed that Shereese be removed from the Francis home and transported to the hospital in this secretive manner for the purpose of concealing from her family the fact that she had been killed.

**K.    NYPD's Culture, Custom and Practice of Disregard for Persons with Mental Illness.**

181.    NYPD's culture of disregard for persons with mental illness is manifest in NYPD's repeated failures to effectively train and supervise NYPD officers for interactions with persons with mental illness.

182.    Numerous persons with mental illness, in addition to Shereese Francis, have died as a result of these failures, including:

a.   On October 2, 2012, police responded to an ambulance call placed by the mother of Mohamed Bah. Bah's mother sought psychiatric attention for her son because he would not leave his apartment and was depressed. Police provoked a confrontation with Bah and then tasered, shot and killed him.

b.   On October 3, 2010, police shot and killed Emmanuel Paulino, a man diagnosed with mental illness, in the Inwood section of Manhattan. According to eyewitnesses, Paulino was walking in circles and speaking to himself when police shot him 18 times from a distance of 30 feet.

c.   In 2008, NYPD officers responded to a call from the mother of 35-year-old Iman Morales, who wasn't answering his front door. When police arrived at the Bedford-Stuyvesant apartment, Morales, naked, retreated out the window and onto a ledge 10 feet above the sidewalk. Police called for an inflatable air bag to place

on the sidewalk under Morales, but didn't wait for it to arrive before shooting him with a Taser. Morales went stiff, fell headfirst from the ledge onto the sidewalk, and died.

d.   On November 12, 2007, NYPD officers shot and killed Khiel Coppin, an 18 year-old with a psychiatric history. Coppin's mother told police that he was unarmed, but police shot him believing that a hairbrush he held under his shirt was a gun.

e.   On November 18, 2007, NYPD officers shot and killed David Kostovski, a 29 year-old with a psychiatric history. Kostovski brandished a broken bottle at police when they cornered him, to which police responded with a hail of gunfire.

f.   In February, 2006, Stephanie Lindboe, a 65 year old woman believed to have been emotionally disturbed, was shot twice by a police officer in her apartment building.

g.   On August 30, 1999, NYPD officers shot and killed Gideon Busch, a 31 year-old with a psychiatric history. Busch, an observant Jew, was in his apartment when six police officers confronted him and attempted to subdue him with pepper spray. Busch became upset, striking out with a small hammer intended for ritual religious use. Four officers fired on Busch, killing him.

183.   Upon information and belief, the Supervisory Officer Defendants were aware, or in the exercise of reasonable diligence should have been aware, of reports and complaints against one or more of the Police Officer Defendants with respect to the use of excessive force and/or mistreatment of persons with mental illness prior to March 15, 2012, but failed to take reasonable disciplinary or other corrective action to prevent misconduct. That failure to take corrective action constitutes deliberate indifference that caused the assault, mistreatment and death of Shereese Francis.

184.   Upon information and belief, the City, NYPD and the Supervisory Officer Defendants were or should have been aware of the past unlawful, reckless, and wanton treatment received by persons with mental illness from the Police Officer Defendants and

other NYPD police officers, yet failed to adequately supervise or train with respect to such treatment, including but not limited to the need for patience, the requirement that a supervisory officer be present, the need to involve family members as appropriate in the encounter, and the safe and proper use of equipment and restraint techniques.  That persistent and widespread failure to adequately supervise and train NYPD personnel constitutes deliberate indifference that caused the assault, mistreatment and death of Shereese Francis.

185.    The failures of the Supervisory Officer Defendants, NYPD and the City permitted the Police Officer Defendants to be in a position to unlawfully assault and kill Shereese Francis, to cover it up and to otherwise violate her state and constitutional rights.

186.    As a result of the foregoing, plaintiffs have been deprived of the love, affection and support of their family member and have suffered a grave loss to their family relationship.

### COUNT ONE – VIOLATION of 42 U.S.C. § 1983
### (AGAINST THE INDIVIDUAL DEFENDANTS)

187.    Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

188.    By reason of the foregoing, defendants, acting under color of state law, violated 42 U.S.C. Section 1983 by depriving Shereese Francis of her rights under the Fourth and Fourteenth Amendments to the United States Constitution, including without limitation the rights to be free from (*a*) the intentional use of unreasonable force; (*b*)

unnecessary and wanton infliction of pain; (*c*) the prevention and denial of critical

medical attention; and (*d*) the deprivation of life and liberty without due process of law.

189.    As a direct and proximate result of said violations, Shereese Francis and

plaintiffs suffered the injuries and damages in an amount to be determined at trial.

## COUNT TWO – VIOLATION of 42 U.S.C. § 1983
## (SUPERVISORY LIABILITY/FAILURE TO TRAIN)
## (AGAINST THE SUPERVISORY OFFICER DEFENDANTS)

190.    Plaintiffs reallege each allegation contained in the preceding paragraphs as

if set forth separately herein.

191.    By reason of the foregoing, defendants McKoy and Richard Roes 1-10,

NYPD supervisory personnel, acted with reckless disregard and deliberate indifference in

the supervision of the Individual Defendants, thereby causing the assault, injury and

death of Shereese Francis in violation of 42 U.S.C. Section 1983, and the violation of

other of her rights secured by the United States Constitution.

192.    As a direct and proximate result of said violations, Shereese Francis and

plaintiffs suffered the injuries and damages described above in an amount to be

determined at trial.

## COUNT THREE – VIOLATION of 42 U.S.C. § 1983 (*MONELL* LIABILITY)
## (AGAINST THE CITY)

193.    Plaintiffs reallege each allegation contained in the preceding paragraphs as

if set forth separately herein.

194.    The City of New York has developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of Shereese Francis's rights.

195.    It has been the policy and/or custom or practice of the City to inadequately and improperly investigate complaints of physical abuse by NYPD police officers.

196.    Instead, acts of brutality against citizens have been tolerated by the City, its employees and agents, who substantially failed to appropriately investigate, deliberate, and discipline NYPD personnel who engaged in such conduct.

197.    It has been a custom, policy, and/or practice of the City to conduct inadequate screening in the hiring and retention of police officers for their propensity for violence and bias against and insensitivity toward persons in emotional crisis and/or with mental illness.

198.    It was a custom, policy, and/or practice of the City to fail to adequately train, supervise and discipline police officers such that the public and particularly persons in emotional crisis would not be placed in unreasonable risk of being the victims of violent behavior by the police.

199.    As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies and the City's deliberate indifference, Shereese Francis's constitutional rights were violated, resulting in injuries and damages in an amount to be determined at trial.

## COUNT FOUR – DISABILITY DISCRIMINATION
## IN VIOLATION OF 42 U.S.C.A. § 12132 and 29 U.S.C. § 794(a)
## (AGAINST THE CITY AND NYPD)

200.    Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

201.    Shereese Francis was a disabled person by virtue of a mental impairment that substantially limited one or more of her major life activities, including her ability to maintain employment and to interact with strangers, and was regarded as such by the officers who visited the Francis home on the night of March 15, 2012.

202.    The participation of NYPD officers in ambulance calls such as that made by the Individual Defendants to the Francis home on the evening of March 15, 2012 is a program and activity of NYPD and the City.

203.    NYPD is a federally-funded program of the City.

204.    On March 15, 2012, Shereese Francis met the essential eligibility requirements for the receipt of NYPD services in connection with ambulance calls.

205.    Shereese Francis was discriminated against, and deprived of equal access to and the benefits of, police services in connection with the March 15, 2012 ambulance call to her home because of her disability, because the officers who antagonized, pursued, restrained, beat and/or applied electric current to her misperceived the effects of her disability — her inability to understand that they were police officers — as criminal behavior justifying her restraint and arrest.

206.    Shereese Francis was discriminated against, and deprived of equal access to and the benefits of, police services in connection with the March 15, 2012 ambulance

call to her home because of her disability, because the officers who antagonized, pursued, restrained, beat and/or applied electric current to her on March 15, 2012 failed to reasonably accommodate her disability, by needlessly challenging, confronting and antagonizing her, by rushing their encounter with her, by not waiting for a supervisor or other more highly-trained officer to arrive at the scene before attempting to restrain her, by not using her family members to assist in calming her, and by using force instead of other readily-available techniques for de-escalating the situation.

207.    As a direct and proximate result of said violations, Shereese Francis and plaintiffs suffered the injuries and damages described above in an amount to be determined at trial.

### COUNT FIVE – SURVIVAL CLAIM FOR ASSAULT AND BATTERY UNDER NEW YORK EPTL § 11-3.2(b) (AGAINST THE POLICE OFFICER DEFENDANTS)

208.    Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

209.    By reason of the foregoing, defendants intentionally placed Shereese Francis in apprehension of imminent harmful contact and without her consent, intentionally caused offensive and harmful bodily contact to Shereese Francis, including without limitation by pursuing her, grabbing her by the arms, tackling her, placing their weight upon her, pulling her hands behind her back while she lay face down, beating her, applying electric current to her, and/or asphyxiating her.

210.    As a result of the foregoing Shereese Francis suffered grievous bodily harm, substantial physical and emotional pain and loss of life.

36

211.    As a consequence, Shereese Francis and plaintiffs suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

### COUNT SIX – SURVIVAL CLAIM FOR
### NEGLIGENCE AND GROSS NEGLIGENCE
### UNDER NEW YORK EPTL § 11-3.2(b)
### (AGAINST THE POLICE OFFICER DEFENDANTS)

212.    Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

213.    Defendants owed a duty of reasonable care in their interactions with Shereese Francis to avoid causing her unnecessary injury or harm, including without limitation through the use of excessive force.

214.    Defendants, while holding Shereese Francis in their custody, prevented her from obtaining timely medical care from the members of her family or from the EMTs who were in her home, aggravating her injuries, prolonging her pain and suffering, and causing her injuries to worsen and lead to death.

215.    Defendants knew or should have known that antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical care and applying electric current to Shereese Francis would result in causing her severe emotional distress and physical injury, pain and suffering.

216.    The acts of defendants on March 15, 2012, including without limitation their antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical care and applying electric current to Shereese Francis, caused her severe emotional distress and physical injury, pain and suffering.

37

217.     The acts of defendants on March 15, 2012, including without limitation their antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical care and applying electric current to Shereese Francis, constituted negligence, gross negligence, recklessness, and/or willful and wanton conduct.

218.     As a result of the foregoing Shereese Francis suffered grievous bodily harm, substantial physical and emotional pain and loss of life.

219.     As a consequence, Shereese Francis and plaintiffs suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

**COUNT SEVEN – SURVIVAL CLAIM FOR
FAILURE TO TRAIN AND SUPERVISE UNDER NEW YORK EPTL § 11-3.2(b)
(AGAINST THE SUPERVISORY OFFICER DEFENDANTS)**

220.     Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

221.     The participation by police officers in ambulance calls involving persons with mental illness is a delicate task requiring specialized knowledge and training.

222.     Defendants have a duty to ensure that NYPD personnel responding to ambulance calls have the requisite specialized knowledge and training, do not violate their duties, and that they follow applicable rules, regulations and guidelines.

223.     The foregoing acts and omissions of defendants, including without limitation the failure to provide minimally adequate supervision and training to the Police Officer Defendants, caused Shereese Francis severe emotional distress and physical injury, pain and suffering, and loss of life.

224. As a consequence, Shereese Francis and plaintiffs suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

## COUNT EIGHT – WRONGFUL DEATH
## UNDER NEW YORK EPTL § 5-4.1(1)
## (AGAINST THE CITY AND THE INDIVIDUAL DEFENDANTS)

225. Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

226. Due to the foregoing acts and omissions, and as a result of the City's and the Individual Defendants' negligence, gross negligence, recklessness, and/or willful and wanton conduct, Shereese Francis sustained injuries causing her death, depriving plaintiffs of her financial contributions, society and guidance, and an expected inheritance from the decedent, as well as other pecuniary losses, in an amount to be proven at trial.

## COUNT NINE – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST THE INDIVIDUAL DEFENDANTS)

227. Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

228. Several of the Individual Defendants made false statements and deliberately misled Eleen Francis and Shauna Francis into believing that Shereese Francis was alive, when in fact those defendants knew she was dead.

229. For a period of approximately 90 minutes preceding midnight on March 15, 2012, Eleen Francis and Shauna Francis and other Francis family members made

repeated attempts to gain physical or visual access to Shereese Francis, each of which was deliberately thwarted by one or more of the Individual Defendants.

230.    In denying access to the body of Shereese Francis to her next of kin after her death, and keeping plaintiffs ignorant of the fact of Shereese Francis's death, defendants negligently inflicted severe emotional distress upon Eleen, George and Shauna Francis, as a result of which they suffered damages and losses, in amounts to be determined at trial.

## COUNT TEN –
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST THE INDIVIDUAL DEFENDANTS)

231.    Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

232.    The foregoing acts and omissions of the Individual Defendants, undertaken recklessly, with deliberate indifference, wantonly and willfully and maliciously, constitute extreme and outrageous conduct beyond the bounds of civilized behavior, which shocks the conscience.

233.    The foregoing acts and omissions of the Individual Defendants have caused plaintiffs severe emotional distress and mental anguish, as a result of which they have suffered damages and losses, in amounts to be determined at trial.

## COUNT ELEVEN – RESPONDEAT SUPERIOR
## (AGAINST THE CITY)

234.    Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

235.     The acts and omissions of the Individual Defendants described above were committed in the course and within the scope of their employment by the City.

236.     As the employer of the Individual Defendants, the City is vicariously liable for the damage and losses caused to plaintiffs in amounts to be determined at trial.

## COUNT TWLEVE – WRONGFUL DEATH UNDER NEW YORK EPTL § 5-4.1(1) (AGAINST QUIROA AND SCHROETER)

237.     Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

238.     Quiroa and/or Schroeter each breached a duty of reasonable care in providing emergency treatment to Shereese Francis, by improperly intubating her and by failing to recognize the mistake, and this breach or breaches contributed in causing the wrongful death of Shereese Francis.

239.     Due to the foregoing acts and omissions, and as a result of Quiroa's and/or Schroeter's negligence, Shereese Francis died, depriving plaintiffs of her financial contributions, society and guidance, and an expected inheritance from the decedent, as well as other pecuniary losses, in an amount to be proven at trial.

## COUNT THIRTEEN – RESPONDEAT SUPERIOR (AGAINST JHMC AND JHMC AMBULANCE)

240.     Plaintiffs reallege each allegation contained in the preceding paragraphs as if set forth separately herein.

241.     The acts and omissions of Quiroa and Schroeter described above were committed in the course and within the scope of their employment by JHMC and/or JHMC Ambulance.

41

242.    As the employer of Quiroa and Schroeter, JHMC and/or JHMC

Ambulance is or are vicariously liable for the damage and losses caused to plaintiffs in

amounts to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, for punitive

and/or compensatory damages, jointly and severally, in an amount to be determined at

trial, and against defendants, jointly and severally, and for attorneys fees, costs and

disbursements.

Dated:          New York, New York
                November 1, 2013


By:     _____/s/_____
                Steve Vaccaro
                Law Office of Vaccaro and White
                225 Broadway, 13th floor
                New York, NY 10007


By:     _____/s/_____
                David B. Rankin
                Robert M. Quackenbush
                Law Office of Rankin & Taylor
                11 Park Place, Suite 914
                New York, NY 10007